People v Meadows (2020 NY Slip Op 02827)





People v Meadows


2020 NY Slip Op 02827


Decided on May 14, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 14, 2020

110483

[*1]The People of the State of New York, Respondent,
v
Kiamani J. Meadows, Appellant.

Calendar Date: March 25, 2020

Before: Lynch, J.P., Mulvey, Devine, Aarons and Colangelo, JJ.


Mark A. Diamond, Albany, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Susan Rider-Ulacco of counsel), for respondent.



Lynch, J.P.
Appeal from a judgment of the County Court of Chemung County (Baker, J.), rendered July 9, 2018, upon a verdict convicting defendant of the crimes of murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree.
In July 2017, defendant was charged by indictment with murder in the second degree, criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree. The charges stemmed from defendant shooting and killing the victim on a street in the Town of Elmira, Chemung County. After a jury trial, defendant was convicted as charged.[FN1] He was sentenced, as a second felony offender, to concurrent prison terms of 25 years to life for his conviction of murder in the second degree, 15 years, followed by five years of postrelease supervision, for his conviction of criminal possession of a weapon in the second degree, and 3½ to 7 years for his conviction of criminal possession of a weapon in the third degree. Defendant appeals.
Defendant contends that his verdict was not based on legally sufficient evidence and was against the weight of the evidence because the evidence did not show that he was the individual who shot the victim or possessed the firearm. Initially, defendant failed to preserve his legal sufficiency challenge by making only a general objection at the close of the People's proof (see People v McCollum, 176 AD3d 1402, 1403 [2019]). "Nevertheless, in reviewing defendant's argument that the verdict is against the weight of the evidence, this Court necessarily must ensure that the People proved each element of [each] crime beyond a reasonable doubt" (People v Brinkley, 174 AD3d 1159, 1160 [2019] [citations omitted], lv denied 34 NY3d 979 [2019]; see People v Harris, 177 AD3d 1199, 1200 [2019]). "[W]hen undertaking a weight of the evidence review, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Hernandez, 180 AD3d 1234, 1235 [2020] [internal quotation marks, brackets and citations omitted]; see People v Fragassi, 178 AD3d 1153, 1154 [2019], lv denied 34 NY3d 1128 [2020]).
As relevant here, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). A person is guilty of criminal possession of a weapon in the second degree when, "with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]). Finally, a person is guilty of criminal possession of a weapon in the third degree when "[s]uch person commits the crime of criminal possession of a weapon in the fourth degree as defined in [Penal Law § 265.01 (1), (2), (3) or (5)] and has been previously convicted of any crime" (Penal Law § 265.02 [1]). A person is guilty of criminal possession of a weapon in the fourth degree when "[h]e or she possesses any firearm" (Penal Law § 265.01 [1]).
At trial, text messages admitted into evidence revealed that, leading up to the day of the incident, on December 9, 2016, defendant messaged the victim asking her to "[c]ome to Elmira" and stating that he would pick her up from the bus station. The victim messaged defendant that she was expecting to be living with him after arriving in Elmira, stating, "[t]his is about you and me for the rest of our lives." On December 11, 2016, the victim messaged defendant informing him that someone had stolen her cell phone and, using another individual's cell phone, the victim informed defendant that she was on the bus to Elmira. Upon her arrival, the victim also used multiple other individuals' cell phones — which several witnesses testified to at trial — to ask defendant to pick her up, but he was no longer willing to do so. One of the messages to defendant stated, "In Elmira because that's where you are" and "[l]ove ya." Eventually, the victim found a shelter in Elmira and provided the name and phone number of defendant as her emergency contact. On December 14, 2016, the victim sent an email to defendant from a library that if he would not reply back, she would send a letter to his mother's address. That day, the victim also messaged defendant to meet her at the bus station. Later that day, shortly after 2:00 p.m., the recovered video footage showed that, after a "greenish in color" vehicle that had a shape of a Nissan Quest arrived and parked near the bus station, an individual walked towards the bus station and came back accompanied by another person. As to what occurred later that day, several witnesses testified that they observed a minivan on the side of the intersection of Draht Hill Road and Jerusalem Hill Road in Elmira — where the incident occurred — between 6:52 p.m. and 7:45 p.m., which was confirmed by another video footage. One of the witnesses testified that he identified that minivan as a dark-colored Nissan Quest. It was later established that defendant drove a green Nissan Quest.
The victim was discovered lying on the side of the road with no pulse around 8:00 p.m. on December 14, 2016. The autopsy of the victim revealed that she had five entry wounds on her head, neck, right shoulder and abdomen. Her cause of death was determined to be from gunshot wounds to her neck and head. The forensic pathologist testified that his examination revealed that the victim was shot in the head at a range of "just a few inches, at most" and .22 caliber bullets were recovered from the body. One witness testified that, following the incident, he heard defendant discussing with others at an auto shop the news of a woman's body found on Draht Hill Road, at which time defendant stated that the victim was bothering his mother and that "[s]he deserved it." Defendant's mother testified that the victim sometimes came to her home to speak to defendant, including in November 2016, when the victim again asked to see defendant and defendant's mother told the victim not to come by anymore, as she had a court order against the victim — which defendant's mother admitted was not true.
Additional evidence placed defendant at the scene of the incident. A visualization of defendant's cell phone records revealed that, on the day of the incident, his phone was generally in the vicinity of the bus station around 2:14 p.m., and then, between 6:47 p.m. and 7:38 p.m., his phone was moving away from Draht Hill Road or Jerusalem Hill Road northbound. A State Police investigator with the Computer Crimes Unit testified that defendant's second cell phone contained pictures dated December 14, 2016, taken between 6:41 p.m. to 6:59 p.m., of the moon that additionally portrayed high power towers; when the investigator took pictures on Draht Hill Road, they showed "the same tower configuration and landscape." Furthermore, tire impression evidence was also recovered from the scene of the crime, which revealed that defendant's right front tire shared the same tread and tread design with the impressions found at the scene.
A police officer testified that several days after the incident, defendant was apprehended during a traffic stop. A search of defendant's vehicle revealed two cell phones and a backpack that contained a Smith and Wesson six-shot .22 caliber revolver with black electrical tape wrapped around the grip and six bullets in the cylinder. The backpack also contained a plastic container holding bullets. Forensic examination of the gun determined that a DNA profile of defendant was a major contributor to the DNA discovered on the trigger's housing and the muzzle of the firearm and that his DNA was a contributor to the DNA found on the grip.
Defendant testified that he had known the victim for 13 years, and they kept in contact approximately every five years. Defendant admitted to exchanging text messages with the victim leading up to the incident and that the victim was "bugging" his mother. As to the day of the incident, although initially he denied picking up the victim, defendant admitted that he picked up the victim from the bus station with his van at 2:15 p.m. Defendant then explained that they headed to Lormore Street, where he resides, and the victim left around 4:00 p.m. and he did not see her for the rest of the day. Defendant then stated that he went to see some individuals to purchase marihuana, then "drove around" Elmira to see the moon and went to take pictures of the moon near Draht Hill Road around 7:00 p.m. Defendant also admitted that it was his backpack found in the car but denied ownership of the gun found in it.
Although a different verdict would not have been unreasonable, we find that the verdict is supported by the weight of the evidence. Turning first to defendant's conviction of murder in the second degree, the evidence shows that defendant invited the victim to Elmira and exchanged text messages with her leading up to the incident. Defendant's mother testified, and defendant confirmed, that the victim was bothering his mother, and he did not want the victim to keep contacting his mother. On the day of the incident, witness testimony, as well as other corroborating physical and circumstantial evidence, shows that defendant picked up the victim from the bus station and that, later that day, he was at the scene of the incident during the time that the victim was killed — which defendant himself admitted. Thereafter, a firearm was recovered from defendant's vehicle, which bullets matched those recovered from the victim's body. In light of the foregoing, considering the evidence in a neutral light and according deference to the jury's credibility determinations, we find that the weight of the evidence supports defendant's conviction of murder in the second degree (see Penal Law § 125.25 [1]; see People v Demellier, 174 AD3d 1120, 1123 [2019], lv denied 34 NY3d 980 [2019]).
Turning to defendant's convictions of criminal possession of a weapon in the second and third degrees, the evidence showed that a .22 caliber gun that held six bullets in the cylinder was found in defendant's backpack — which defendant admitted belonged to him. Bullets found with the gun matched the characteristics of expended .22 caliber bullets recovered from the victim's body. Moreover, defendant's DNA was a major contributor to the DNA found on the trigger's housing and the muzzle of the firearm and a contributor to the DNA found on the grip. Notwithstanding defendant's conflicting testimony that the gun did not belong to him, we find that the weight of the evidence supports his convictions of criminal possession of a weapon in the second and third degrees (see Penal Law §§ 265.02 [1]; 265.03 [1] [b]; People v McCoy, 169 AD3d 1260, 1264 [2019], lv denied 33 NY3d 1033 [2019]; People v Johnson, 79 AD3d 1264, 1265 [2010], lv denied 16 NY3d 832 [2011]).
Next, defendant contends that County Court erred in allowing the testimony regarding defendant's purchase of marihuana. "[I]t is well settled that evidence of uncharged crimes or prior bad acts may be admitted where they fall within the recognized Molineux exceptions — motive, intent, absence of mistake, common place or scheme and identity — or where such proof is inextricably interwoven with the charged crimes, provides necessary background or completes a witness's narrative" (People v Saunders, 176 AD3d 1384, 1390 [2019] [internal quotation marks and citations omitted]; see People v Pitt, 170 AD3d 1282, 1284 [2019], lv denied 33 NY3d 1072 [2019]). Here, Sarah Starbuck testified that she knew defendant to have engaged in marihuana transactions with a man named Niko Parker in 2016.[FN2] After Starbuck's testimony, County Court instructed the jury that her testimony regarding defendant's purchase or use of marihuana should not be considered in regard to whether defendant is guilty of the uncharged crimes and was "solely for the limited purposes of explaining background information of how [Starbuck] may have known . . . defendant." This limiting instruction was once again reiterated during the jury charge. In light of the foregoing, we find that the evidence regarding defendant's purchase of marihuana was relevant to establish background of Starbuck's relationship with defendant, as well as to aid the jury in understanding defendant's whereabouts on the day of the incident and his text messages to Parker (see People v Saunders, 176 AD3d at 1390; People v Womack, 143 AD3d 1171, 1173 [2016], lv denied 28 NY3d 1151 [2017]). Furthermore, the court gave proper limiting instructions to minimize the prejudicial effect of the testimony (see People v Gannon, 174 AD3d 1054, 1059 [2019], lv denied 34 NY3d 980 [2019]).
Defendant also contends that County Court erred in denying his motion to suppress certain statements obtained during police interrogation. First, to the extent that defendant contends that his Miranda rights were violated when his interrogation continued despite his invocation of his right to counsel, we have already considered this issue in defendant's prior appeal related to another incident and held that "defendant's isolated statement of 'I could get a lawyer' did not constitute an unequivocal request for counsel" (People v Meadows, 180 AD3d 1244, 1245 [2020]).[FN3] To the extent that defendant contends that the police should have readministered his Miranda rights before the second interrogation, we find this argument without merit. "When a defendant is in continuous custody and not subjected to coercive tactics, delays between the provision of Miranda warnings and later questioning will not necessarily make a defendant's statements involuntary unless the delay is excessive" (People v Carelli, 41 AD3d 1092, 1093 [2007]). "[D]elays of as much as 11 hours between Miranda warnings and subsequent questioning have been countenanced" (id.; see People v Gause, 38 AD3d 999, 1000 [2007], lv denied 9 NY3d 865 [2007]). Here, on December 21, 2016 at 4:22 p.m., defendant was administrated his Miranda rights, which he waived. After the interview, defendant was left alone for several hours before his interview recommenced at approximately 10:30 p.m. In light of the fact that defendant was properly administered his initial Miranda rights and his custody was continuous, an approximate five-hour break between interviews was not so excessive as to require a readministration of Miranda warnings (see People v Gause, 38 AD3d at 1000; People v Lowin, 36 AD3d 1153, 1155 [2007], lv denied 9 NY3d 847 [2007]).
Turning to defendant's contentions of prosecutorial misconduct during summation, as defendant concedes, he failed to preserve his arguments (see People v Scippio, 144 AD3d 1184, 1187 [2016], lv denied 28 NY3d 1150 [2017]). Were these contentions properly before us, we would find that the challenged comments were either made in response to defendant's summation or constituted fair comment on the evidence at trial or, even if improper, "were not so pervasive or flagrant as to require a reversal" (People v Andrade, 172 AD3d 1547, 1553 [2019] [internal quotation marks and citations omitted], lvs denied 34 NY3d 928, 937 [2019]; see People v Johnson, 151 AD3d 1462, 1466 [2017], lv denied 30 NY3d 1106 [2018]).
Finally, defendant contends that defense counsel was ineffective by making various pretrial and trial errors. "A claimed violation of the constitutional right to the effective assistance of counsel will not survive judicial scrutiny so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Houze, 177 AD3d 1184, 1188-1189 [2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 1159 [2020]). Here, defendant contends that his counsel was ineffective because he failed to submit to the jury that defendant's Miranda rights were violated, failed to renew a suppression motion after learning that defendant was not given a second Miranda warning and failed to object to the prosecutor's improper comments during summation. However, as discussed above, these arguments lack merit, and "[c]ounsel's failure to make a motion or argument that has little or no chance of success does not constitute the ineffective assistance of counsel" (People v Bostic, 174 AD3d 1135, 1137 [2019] [internal quotation marks, brackets and citations omitted], lv denied 34 NY3d 1015 [2019]; see People v Pratt, 162 AD3d 1202, 1203 [2018], lv denied 32 NY3d 940 [2018]). Thus, we are satisfied that defendant was provided the effective assistance of counsel.
Mulvey, Devine, Aarons and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: At sentencing, County Court dismissed count 3 of the indictment, charging defendant with criminal possession of a weapon in the second degree.

Footnote 2: Although during the Molineux hearing, County Court granted, over defendant's objection, the People's request to present the testimony of Parker regarding him selling marihuana to defendant, Parker did not testify; instead, Starbuck testified that she had observed Parker sell marihuana to defendant. Thereafter, defense counsel agreed to submit a circumstantial evidence instruction as to the Molineux evidence that came through Starbuck's testimony, instead of objecting to the fact that it was Starbuck's, not Parker's, testimony that was presented.

Footnote 3: Defendant's prior appeal concerned his October 2017 conviction of attempted murder in the second degree, assault in the first degree, three counts of criminal possession of a weapon in the second degree and criminal use of a firearm in the first degree, stemming from an unrelated incident on December 20, 2016 (People v Meadows, 180 AD3d 1244, 1244 [2020]). At a Huntley hearing related to this appeal, the parties stipulated to the testimony and facts as adduced at a prior suppression hearing regarding the December 20, 2016 incident. County Court denied defendant's motion finding that the statements were admissible. Defendant appealed from an October 2017 judgment of conviction, challenging, among other things, County Court's suppression decision (id. at 1245).